UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD MCHONE, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>FAR NORTHERN REGIONAL CENTER, et al.,<br><br>    Defendants. | Case No. 14-cv-03385-EDL<br><br>**ORDER GRANTING DEFENDANT NORTH BAY'S MOTION TO DISMISS; GRANTING DEFENDANT FAR NORTHERN'S MOTION TO DISMISS AND GRANTING DEFENDANT PUCKETT'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 32, 36, 48 |

Plaintiffs Shirley McHone and Edward McHone brought this case pursuant to 42 U.S.C. § 1983, regarding the tragic wrongful death of their developmentally disabled son. Defendant North Bay Developmental Disabilities Services is a non-profit corporation that contracts with the California Department of Developmental Services to provide services and support to individuals diagnosed with a developmental disability in the counties of Napa, Solano and Sonoma. First Amended Complaint ("FAC") ¶ 6. Defendant Far Northern Regional Center is a corporation that contracts with the California Department of Developmental Services to provide services and support to individuals with a developmental disability in the counties of Butte, Glenn, Lassen, Modoc, Plumas, Tehama, Shasta and Siskiyou. FAC ¶ 7. Defendant Puckett Residential Services is a corporation that operates eight residential care facilities, including Baker House, where Plaintiffs' son was living. FAC ¶ 8.

Each Defendant moved to dismiss Plaintiffs' complaint against it. The parties fully briefed the motions and the Court held a hearing on December 16, 2014. For the reasons stated at the hearing and in this Order, the motions to dismiss are granted without leave to amend.

**Allegations from the complaint**

Plaintiffs' son, James Travis McHone ("Travis") was born with Prader-Willis Syndrome

("PWS"), a complex genetic condition that is the most common known genetic cause of life-threatening obesity in children. FAC ¶ 20. PWS causes low muscle tone, short stature, incomplete sexual development and a chronic feeling of hunger that, coupled with a low metabolism, leads to excessive eating and life-threatening obesity. FAC ¶ 20. The average IQ for individuals suffering from PWS is 70, but even those with normal IQs almost all have learning issues. FAC ¶ 20. Social and motor deficits also exist. FAC ¶ 20. Due to his illness, Travis required constant supervision for his own safety. FAC ¶ 20. There is no known cure for PWS. FAC ¶ 20.

The Lanterman Act, California Welfare & Institutions Code section 4500, et seq., sets forth the statutory scheme for providing services to people with developmental disabilities, including PWS. FAC ¶ 21. The California Department of Developmental Services has jurisdiction over the execution of laws relating to the care, treatment and custody of developmentally disabled persons. FAC ¶ 21 (citing Cal. Welf. & Inst. Code § 4416). Under the Act, the state undertakes the obligation to provide "an array of services and supports . . . to meet the needs and choices of the developmentally disabled. FAC ¶ 22 (quoting Cal. Welf. & Inst. Code § 4501). To fulfill that obligation, the law has established regional centers to conduct a number of specified activities for the developmentally disabled. FAC ¶ 22 (citing Cal. Welf. & Inst. Code § 4648(a)). California Welfare and Institutions Code section 4620(b) states:

> The Legislature finds that the service provided to individuals and their families by regional centers is of such a special and unique nature that it cannot be satisfactorily provided by state agencies. Therefore, private nonprofit community agencies shall be utilized by the state for the purpose of operating regional centers.

A regional center may purchase services "pursuant to a vendorization or a contract" to provide services and support. FAC ¶ 22 (quoting Cal. Welf. & Inst. Code § 4648(a)(1) & (3)). Vendorization or contracting is the "process for identification, selection and utilization of service vendors or contractors, based on the qualifications and other requirements necessary in order to provide the service." FAC ¶ 22 (quoting Cal. Welf. & Inst. Code § 4648(a)(3)(A)). Regional centers are responsible for assessing developmentally disabled persons and on an individualized basis, selecting and providing services to meet such needs, including selecting the vendors and

ensuring that the services provided are in compliance with their contracts and applicable state laws and regulations. FAC ¶ 22.

A network of twenty-one regional centers is responsible for determining eligibility, assessing needs and coordinating and delivering direct services to individuals with developmental disabilities within a defined geographic area. FAC ¶ 23 (citing Cal. Welf. & Inst. Code § 4620). The California Department of Developmental Services allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports. FAC ¶ 23 (citing Cal. Welf. & Inst. Code §§ 4620, 4621, 4787). The specific rights to services of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan ("IPP") procedure. FAC ¶ 24 (citing Cal. Welf. & Inst. Code §§ 4646-4648). The applicable regulations specify the program design and staffing ratios that service level 1 through 4 facilities must possess in order to be approved to provide direct supervision and special services. FAC ¶ 25 (citing Cal. Code Regs., Tit. 17, §§ 56002, subds. (a)(14), (44) & (48), 56004-56005).

Plaintiff alleges that facilities providing service level 1 (the most minimal services) through level 4 (for individuals with severe deficits in self-care or other behaviors) must be vendorized by a regional center. FAC ¶ 25; see also Cal. Code Regs., tit. 17, § 56004, subd. (b). One requirement of the vendor application is to confirm that the facility is capable of providing, and is certified or licensed to perform, the services it seeks to provide. FAC ¶ 25; Cal. Code Regs., tit. 17, § 54310.

Travis was originally assigned to the San Diego Regional Center, but was transferred to Defendant North Bay Development Disabilities Services, and was in the process of being transferred to Defendant Far Northern Regional Center at the time that he resided in Baker House. FAC ¶ 26. Far Northern is responsible for Baker House, which is owned by Defendant Puckett. FAC ¶¶ 26, 29. Both regional centers are governed by the Lanterman Act. FAC ¶ 27. Baker House is a Level 4 provider. FAC ¶ 27.

When Travis was under the supervision of the San Diego Regional Center, he had an IPP, as required by the Lanterman Act. FAC ¶ 34. The IPP noted that: "Travis requires 24-hour

3

supervision and someone needs to be present during waking hours for his personal, health and safety," and that: "Travis has limited safety awareness skills." FAC ¶ 34. In May 2012, he was put on an involuntary psychiatric hold and was transported by the police to San Diego County Mental Health. FAC ¶ 34. Staff at the San Diego facility called the police because while he was out in the community with staff, Travis damaged several cars. FAC ¶ 34.

A few months later, in August 2012, a Client Development Evaluation Report stated that Travis required someone nearby during waking hours to prevent injury or harm in all settings, and that his self-injurious behavior caused injury requiring first aid or medical care at least once per week. FAC ¶ 35. Other contemporaneous records indicate that Travis previously displayed physical aggression and had left the premises without permission. FAC ¶ 35.

A Consumer Placement Referral prepared by the San Diego Regional Center in 2012 states that "Travis needs to be reminded to look both ways when crossing. At times, he can be forgetful and will get in front of cars." FAC ¶ 36. Plaintiff alleges that within Defendant Puckett's records, the section containing this statement has a handwritten note indicating that someone specifically read the section and noted it as important. FAC ¶ 36.

On October 23, 2013, Baker House and North Bay entered into an Admission Agreement in which Baker House agreed to provide "24-hour personal care, protection, supervision, assistance, and guidance in a safe and suitable facility." FAC ¶ 28. On October 25, 2013, Travis was admitted to Baker House, which at the relevant time had six residents. FAC ¶ 29. North Bay and Far Northern employees worked together to ensure Travis' placement at Baker House through a courtesy vendorization placement, including a placement packet from North Bay that contained relevant information about Travis for his placement at Baker House. FAC ¶ 30. On October 23, 2013, a Baker House representative prepared a memo to all staff regarding the care of Travis, but Plaintiff alleges that the memo revealed only some but not all pertinent information about Travis and his needs to ensure his personal safety. FAC ¶ 31. Plaintiff alleges that the memo failed to reveal that Travis will strike others if he feels threatened and will struggle to break free if several people attempt to restrain him. FAC ¶ 31.

Baker House Administrator Defendant Gates assured Plaintiffs that Travis would be under

4

constant supervision and that the group home door and window alarms would stay on at all times. FAC ¶ 33. Strong male staff members had been hired to work rotating shifts to provide required supervision for Travis. FAC ¶ 33.

On October 26, 2013, Travis' father informed Baker House staff that Travis would elope if angry or hungry, and that he would eat out of garbage. FAC ¶ 37. Plaintiff alleges that records indicate that Baker House noted that if Travis was mad or hungry, ". . . we go outside with him or not let him go if he's in some mood." FAC ¶ 37. Within the first week of arriving at Baker House, Travis was reacting negatively to his new environment and had been physically aggressive on at least five occasions, including pushing, hitting, kicking, and scratching staff. FAC ¶ 38. He was also verbally abusive towards staff and peers. FAC ¶ 38.

On November 4, 2013, Travis cussed at and attempted to hit a female staff member. FAC ¶ 40. A male staff member switched places with the female staff member and Travis attempted to kick the male staff member. FAC ¶ 40. It took two hours for Travis to calm down. FAC ¶ 40.

On the same day, at 10:00 p.m., Travis left his room and walked out the front door of Baker House in front of a staff member and into the street. FAC ¶ 41. A female staff member shadowed Travis, but lost him when a vehicle drove by with high beams on, and the staff member tried to flag the vehicle down. FAC ¶ 41. The staff member called 911, and searched for Travis by car, but did not find him. FAC ¶ 41. Travis returned on his own two hours later. FAC ¶ 41. After this incident, Plaintiffs offered to fund the purchase of a fence to enclose Baker House as a secondary measure of safety. FAC ¶ 41. Puckett, through its employee Gates, refused. FAC ¶ 41.

On November 5, 2013, Gates met with a male staff member, Travis and Plaintiffs. FCA ¶ 42. Gates warned Travis that she had permission: "to do whatever it takes to keep you and other people safe. . . I am willing to hear your side of it but the minute you get aggressive, I'm not going to negotiate for you with the staff. We have a zero tolerance on hurting people. . . You are an adult, if you hit them they can call the police." FAC ¶ 42.

On November 7, 2013, Puckett instructed staff not to engage Travis or let him get close enough to touch. FAC ¶ 43. Two staff members were injured and the Baker House had double staffing with two awake staff members due to Travis' unpredictability in eloping late at night and

assaulting staff without provocation. FAC ¶ 44.

On November 8, 2013, Gates requested that Community Care Licensing begin the process of evicting Travis effective that day. FAC ¶ 45. The request indicated that Travis was a "threat to himself and others," and a "danger to himself and others," and that his unwillingness to follow the program "endangers him, other consumers and staff." FAC ¶ 45. The request concluded that Travis was not "appropriate for Baker House." FAC ¶ 45.

On November 11, 2013, Travis tried to steal food and rushed a female staff member, requiring that he be restrained from hitting or kicking. FAC ¶ 46. A staff note stated: "No pressure is to be put on Travis. Pretty much let him do what he wants. He will be moving back to Vacaville hopefully soon." FAC ¶ 46.

On November 12, 2013, Travis was hungry, so he told staff members: "I hope you know that I know how to hitchhike" because he wanted more food. FAC ¶ 47. Travis left Baker House, followed by Defendant McGill. FAC ¶ 47. A staff member grabbed a spotlight and reflector vest for McGill and informed other staff that Travis was eloping. FAC ¶ 47. Travis walked onto Baker Road as McGill followed him from behind, shining a spotlight to warn oncoming traffic and to coax him back to Baker House. FAC ¶ 49. McGill had not called 911. FAC ¶ 49. Approximately ten vehicles approached from both directions and slowed for Travis in the roadway as McGill shined the spotlight. FAC ¶ 50. She was standing on the shoulder of the road adjacent to Travis who was in the middle of the dark road. FAC ¶ 50. Travis walked for about a half mile. FAC ¶ 48. At 8:15 p.m., he was struck by a truck on State Route 36, a two lane highway. FAC ¶ 48. The truck had attempted to stop but was unable to do so. FAC ¶ 50. The road was clear and dry, but was dark with no street lights or walkway. FAC ¶ 48. Travis died at the scene, eighteen days after being placed at Baker House. FAC ¶¶ 32, 51.

**Legal Standard**

A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal,</u> 129 S. Ct. 1937, 1949 (2009) (citing <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007)). The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and

construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 129 S. Ct. at 1949. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 1950. Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

Courts must then determine whether the factual allegations in the complaint "plausibly give rise to an entitlement of relief." Id. Though the plausibility inquiry "is not akin to a probability requirement," a complaint will not survive a motion to dismiss if its factual allegations "do not permit the court to infer more than the mere possibility of misconduct . . . ." Id. at 1949 (internal quotation marks omitted) & 1950. That is to say, plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

**Discussion**

1.  **Defendant North Bay's Motion to Dismiss**

    A.  **Section 1983 claim**

    "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). While generally not applicable to private parties, a § 1983 action may lie against a private party when "he is a willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Here, North Bay argues that Plaintiff has failed to state a claim for a § 1983 violation because North Bay is not a state actor and because Plaintiff has not alleged a constitutional violation. Because the former reason is dispositive, the Court does not reach the latter issue.

    i.  **North Bay is not a state actor in this case**

    Courts have developed four tests to determine if a private actor was acting as a state actor for purposes of § 1983: "(1) public function; (2) joint action; (3) governmental compulsion or

7

coercion; and (4) governmental nexus." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003). Here, Plaintiffs rely on the public function test, the governmental compulsion test and the governmental nexus test, although they argue that the public function test is the most applicable.

### a. Public function test

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Lee v. Katz, 276 F.3d 550, 554-55 (9th Cir. 2002). The public function test is satisfied only on a showing that the function at issue is "both traditionally and exclusively governmental." Id. at 555.

Plaintiffs have alleged that North Bay exists "only for the governmental purpose of caring for the rights and needs of developmentally disabled individuals." FAC ¶ 54. Yet the public function test is only satisfied upon a showing that the function at issue is both "traditionally *and* exclusively governmental." Lee, 276 F.3d at 555 (emphasis added). Within the Lanterman Act, the government created a system in which "both state agencies and private entities have functions." Association for Retarded Citizens- California v. Department of Developmental Services, 38 Cal.3d 384, 389 (1985). As noted above, California Welfare and Institutions Code section 4620(b) expressly recognizes the essential role of the private sector working in the community to provide what the government cannot:

> The Legislature finds that the service provided to individuals and their families by regional centers is of such a special and unique nature that *it cannot be satisfactorily provided by state agencies.* Therefore, private nonprofit community agencies shall be utilized by the state for the purpose of operating regional centers.

Cal. Welf. & Inst. Code § 4620(b) (emphasis added); see also Morohoshi v. Pacific Home, 34 Cal.4th 482, 488 (2004) (quoting Cal. Welf. & Inst. Code § 4620(b)). The care of developmentally disabled individuals is provided pursuant to a division of labor between the state and private entities, rather than as an exclusive government function.

Plaintiffs, however, argue that the state's express delegation of authority to private agencies like North Bay under the Lanterman Act converts North Bay into a state actor for purposes of § 1983. First, Plaintiffs points out that even before the Lanterman Act was enacted in

8

1969, individuals with developmental disabilities were administered through California's mental health department and were treated in state hospitals since 1853. While state hospitals did institutionalize some of them, Plaintiffs cannot dispute that others were cared for privately by family or others in local communities. Further, the authority cited by Plaintiffs for this proposition is inapposite. Samantha C. v. State Dep't of Developmental Servs., 185 Cal.App.4th 1462, 1483 (2010) did not address the history of coordinating services for the developmentally disabled, and instead addressed the question of whether the Department of Developmental Services properly found that the plaintiff did not have a developmental disability. Further, the website cited by Plaintiffs states that California's history of mental health services began with the opening of a state hospital in 1853, but does not indicate that care of developmentally disabled individuals was within the exclusive province of the state.

Next, Plaintiffs argue that the Lanterman Act itself demonstrates that the functions of the regional centers are not only fairly attributable to the government, but are in fact government functions, relying on Pistoresi v. Madera Irrigation Dist., 2009 WL 256755 (E.D. Cal. Feb. 3, 2009). In Pistoresi, a plaintiff sued a defendant, an irrigation company authorized under state law to maintain ditches and other similar functions, under § 1983 based on an alleged conspiracy between the defendant and others to prevent the plaintiff from speaking at and attending board meetings. On a motion to dismiss, the court held that the defendant was acting under color of state law for purposes of § 1983. The defendant was formed for the purpose of supplying water to farmers in its service area and organized under state law, and significantly, state law expressly provided that irrigation districts like the defendant "are state agencies formed and existing for governmental purposes." Id. at *6-7 (quoting Cal. Water Code § 20570). By contrast, there is no statute stating that a regional center, which is a private organization, is a state agency. Pistoresi does not support the result that North Bay is a state actor; to the contrary, California Welfare and Institutions Code section 4620(b) states the opposite.

Further, Plaintiffs argue that the state's express delegation of authority to private non-profit corporations such as North Bay to coordinate and secure services for developmentally disabled individuals with providers such as Baker House, coupled with extensive state regulation of

9

regional centers, converts North Bay into a state actor, citing <u>Fialkowski v. Greenwich Home for Children</u>, 683 F. Supp. 103 (E.D. Pa. 1987). In <u>Fialkowski</u>, the parents of a developmentally disabled man who died while in residential care in Pennsylvania brought an action under § 1983 against the residential home as well as the entity that was in charge of arranging, monitoring and coordinating care for developmentally disabled individuals under Pennsylvania law. The court found that the coordinating entity was a state actor for purposes of § 1983. The court concluded:

> Where the state chooses to delegate these responsibilities, and an institution or other private entity chooses to assume them, neither the state nor the private entity may assert that the entity's acts and omissions do not occur under color of state law. . . . As stated in <u>Davenport</u>, "to hold otherwise would allow the state to avoid its constitutional obligations simply by delegating to private hospitals its responsibility for the care of individuals it *involuntarily* confines, and would render meaningless the recently recognized rights of the involuntarily committed." 633 F.Supp. at 1234 (citation omitted).

<u>Id.</u> at 105 (internal citations omitted) (emphasis added). <u>Failkowski</u> provides some support for Plaintiffs here, but it is not binding and addresses another state's statutory framework and history. Moreover, it reasons that Pennsylvania had a nondelegable duty to provide medical care for those involuntarily institutionalized. Here, Travis was not institutionalized involuntarily but was voluntarily placed in Defendants' care.

Plaintiffs also rely on <u>Ruffler v. Phelps Memorial Hosp.</u>, 453 F. Supp. 1062, 1070 (E.D. N.Y. 1978) in which the plaintiff brought a civil rights action against a county, a county medical center, hospitals and a psychiatrist to recover damages for an alleged involuntary and unlawful hospitalization. The court relied on several facts to find state action by the private hospital: (1) the state's explicit assumption of governmental responsibility for mental health care; (2) its extensive statutory regulation of the terms of civil commitment of the mentally disabled; (3) the considerable historical tradition of state involvement with involuntary civil commitment; and (4) the state statute expressly including the defendant hospital among the institutions authorized to participate in the governmental function of caring for the mentally disabled. <u>Id.</u> at 1068-69 ("This court concludes that New York State's explicit assumption of governmental responsibility for mental health care, and its extensive statutory regulation of the terms of civil commitment of the mentally disabled, fundamentally distinguish the activity of New York Hospital here in issue *the*

*involuntary confinement and treatment of the plaintiff* from other fields of activity which the Second Circuit has refused to characterize as inherently 'public functions' constituting state action.") (emphasis added). Again, Ruffler addressed the involuntary commitment of a mentally ill person, a traditional coercive state function. The Ruffler court emphasized that: "It is precisely the execution by New York Hospital of the specific conduct regulated and controlled by the state the involuntary commitment, continued confinement and medical care of the mentally disabled that is challenged by the plaintiff." Id. By contrast, Plaintiffs here do not challenge an involuntary commitment in a large hospital. Instead, the Lanterman Act deinstitutionalized care and provided for voluntary private placements in nonprofit group homes in local communities.

North Bay relies on a subsequent case also arising in Pennsylvania, Schneider v. Arc of Montgomery County, 497 F. Supp. 2d 651 (E.D. Pa. 2007). In Schneider, the plaintiff alleged that she was terminated after she reported that the defendants, non-profit corporations providing social services to developmentally disabled individuals, improperly used public funds to build a new headquarters building. With respect to the public function test, the court stated:

> Courts have noted that "while many functions have been traditionally performed by governments, very few have been exclusively reserved to the state." Graham v. City of Phil., 2002 WL 1608230, at *6 (E.D.Pa. July 17, 2002) (citations omitted).
>
> In Pennsylvania, as with the United States more broadly, the care of individuals with developmental disabilities has traditionally been seen as a family and local concern. See James W. Trent, Inventing the Feeble Mind: A History of Mental Retardation in the United States 2 (1994); Doe v. Rosenberg, 996 F.Supp. 343, 355 (S.D.N.Y.1998) ("Since the beginning of the United States, families, friends, and guardians have cared for the mentally ill privately.") (citing Henry M. Hurd et al., 1 The Institutional Care of the Insane in the United States and Canada 40 (Johns Hopkins Press 1916)). It was not until the mid–1800s that the concern became one of society and the state. Trent, supra, at 2. Pennsylvania played a leading role in developing programs for the developmentally disabled in 1853, when Philadelphia citizens established one of the first American institutions for the developmentally disabled, a private school called the Pennsylvania Training School for the Feeble–Minded. Id. at 15.3 Citizens in other states followed this example soon afterwards, establishing similar schools in their own states. Id.
>
> . . .
>
> In summary, the history of Pennsylvania's provision of care, education, and other services to the developmentally disabled shows

11

> that, while Pennsylvania's administration and funding of such services has grown with time, providing "care, education, and support" to developmentally disabled individuals has never been, and is not now, a traditional and exclusive government function. . . . That the provision of services to the developmentally disabled has evolved to become a public function does not make it a traditional and exclusive function of the state.

Id. at 654-57 ("Yet even if Pennsylvania had traditionally provided services to the developmentally disabled since its founding as a British colony, it still has never been Pennsylvania's 'exclusive' province to do so. As noted earlier, private families have cared for their developmentally disabled members since the earliest history of this country, and they continue to do so today."). Schneider is helpful to North Bay insofar as it recognizes the similar history of significant private and local community care of developmentally disabled individuals in Pennsylvania as in California and many other states. However, it did not expressly disagree with Failkowski, but instead distinguished it on bases not helpful to North Bay.

Most cases addressing situations similar to Plaintiffs' have found that the function of coordinating care like the regional center here is not a traditional and exclusive state function. In Sybalski v. Independent Group Home Living Program, 2007 WL 1202864 (E.D. N.Y. Apr. 24, 2007), the court found that a residential care home that was subject to various certification and licensing requirements under state law was not a state actor. The court observed that Fialkowski and Ruffler were "contrary to the Supreme Court's test for whether a non-state entity's adoption of a 'public function' renders the entity's decision state action." Id. at *5 (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352-53 (1974). Jackson noted that private actors engaged in traditional state functions may be state actors under certain limited circumstances:

> We have, of course, found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State. See, e.g., Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932) (election); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (election); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park). If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the State. The Pennsylvania courts have rejected the contention that the furnishing of utility services is

12

either a state function or a municipal duty. Jackson, 419 U.S. at 352-53. By contrast, the provision of residential care for developmentally disabled individuals is not similar to traditional state functions such as exercising eminent domain and holding elections. See also Dow v. Terramara, 835 F. Supp. 1299, 1303 (D. Kan. 1993) ("Although Terramara performs a public function, it cannot be said that providing services and housing to mentally handicapped adults has been 'traditionally the exclusive prerogative of the State.'") (internal citation omitted).

At the hearing, Plaintiffs argued that Patel v. Kent School Dist., 648 F.3d 965 (9th Cir. 2011) implicitly supports their argument that North Bay is a state actor. In Patel, however, the challenged conduct took place in a public school, not in a residential care home. Further, the Patel court did not decide whether the special education teacher working in the public school acted under color of law because the parties did not dispute that question, id. at 971, but instead found no constitutional violation. Of course, teaching a public student in a public school setting is a traditional state function, even if the special education teacher was technically a private employee. Further, Plaintiffs acknowledge that the court did not address the question here of whether there was state action. Patel does not support Plaintiffs' argument under the public function test.

Accordingly, Plaintiffs have not shown that North Bay is a state actor for purposes of § 1983 under the public function test.

### b. Governmental compulsion test

The compulsion test considers whether the coercive influence or "significant encouragement" of the state effectively converts a private action into a government action. See generally Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 836-37 (9th Cir.1999). However, something more than mere general compulsion is required, such as conspiracy:

> . . . Supreme Court precedent does not suggest that governmental compulsion in the form of a generally applicable law, without more, is sufficient to deem a private entity a governmental actor. Instead, the plaintiff must establish some other nexus sufficient to make it fair to attribute liability to the private entity. Typically, the nexus has consisted of participation by the state in an action ostensibly taken by the private entity, through conspiratorial agreement (Adickes), official cooperation with the private entity to achieve the private entity's goal (Lugar), or enforcement and ratification of the private entity's chosen action (Moose Lodge).

Sutton, 192 F.3d at 841. Plaintiffs argue summarily that because the state commands that regional centers coordinate services, the regional centers satisfy the government compulsion test. See Association for Retarded Citizens, 38 Cal.3d at 390 ("While it is true, as the Attorney General has observed, that the regional centers have 'wide discretion' in determining how to implement the IPP, they have no discretion at all in determining whether to implement it: they must do so.") (internal citation omitted).

However, the conduct at issue here is the manner in which North Bay performed its obligations, which is not compelled by the state. See Association of Retarded Citizens, 38 Cal.3d at 389-90 ("In short, whereas the responsibility of the regional centers is broadly to provide each developmentally disabled person with services that enable him to live a more independent and productive life in the community, the responsibility of DDS, as the Attorney General has concluded on other occasions, is basically limited to promoting the cost-effectiveness of the operations of the regional centers, and does not extend to the control of the manner in which they provide services or in general operate their programs.") (internal citations omitted). As the Supreme Court held in Blum v. Yarestsky, 457 U.S. 991, 1008 (1982), the compulsion test was not satisfied where, although the state in that case required the assessment of whether to discharge a patient from a nursing home, the "decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." Id. Thus, Plaintiffs have not met the compulsion test as to North Bay.

        c.      **Governmental nexus test**

The nexus test asks whether "there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself." Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001) (internal quotations omitted). Plaintiffs state that the regional centers were created and funded by the state in order to fulfill the state's obligation for providing supports and services to the developmentally disabled. Thus, Plaintiffs argue that because North Bay assumed the state's obligation to Travis by contracting with a state agency, there is a sufficient nexus, relying on West v. Atkins, 487 U.S. 42, 55 (1988). However, West addressed medical care in prisons -- by their

nature, involuntary institutions -- which is a delegated power "traditionally associated with sovereignty." See Sybalski, 2007 WL 1202864, at *5.

Further, "the responsibility of a regional center is to 'secure,' not provide, care." Morohoshi, 34 Cal.4th at 489 (internal citation omitted). Here, there are no allegations that the state had any involvement in Travis's admission to Baker House or any other of the alleged acts that occurred there. Receipt of state funds does not convert a private entity into a state actor. Cf. Blum, 457 U.S. at 1011 ("That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business."). Nor does extensive regulation convert a private actor into a state actor. See id. at 1004 ("'[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.'") (internal citation omitted). Even though the governmental nexus test is the "most vague" (see Kirtley, 326 F.3d at 1094) of the state action tests, Plaintiffs have not shown that North Bay was a state actor under this test.

Accordingly, the Court lacks jurisdiction and North Bay's motion to dismiss is granted. The Court need not reach the question of whether Plaintiffs have adequately alleged constitutional violations. Further, because Plaintiffs' only federal claim against North Bay is dismissed with prejudice, the Court declines to exercise supplemental jurisdiction over the remaining state law claim for wrongful death.

**2.  Far Northern's Motion to Dismiss**

Plaintiffs' allegations against Far Northern, which is a regional center like North Bay, are nearly identical to the allegations against North Bay. Thus, for the reasons stated above, Far Northern is also not a state actor. Therefore, the Court need not decide Far Northern's additional argument that it was not responsible for Travis' placement or his treatment because Travis was not Far Northern's client at the time of his death, even though it approved Baker Houes as a Level 4 treatment center, which might well be sufficient if it were a state actor.

Far Northern's motion to dismiss is granted as to Plaintiff's § 1983 claim. Further,

because Plaintiffs' only federal claim against Far Northern is dismissed with prejudice, the Court declines to exercise supplemental jurisdiction over the remaining state law claim for wrongful death.

### 3. Defendant Puckett's Motion to Dismiss

Plaintiffs' allegations against the Puckett Defendants are similar to the allegations against North Bay and Far Northern. Plaintiffs argue that Baker House is a state-vendorized service provider that was state funded and regulated under the Lanterman Act. FAC ¶¶ 26, 32, 54. Puckett had an Admission Agreement with North Bay to provide Travis with residential care. FAC ¶¶ 8, 28. Plaintiffs also allege that Baker House is regulated by the state and monitored by North Bay. FAC ¶ 56. As noted above, however, state licensing or regulation requirements for Baker House do not convert Puckett, a private entity, into a state actor. See Moose Lodge v. Irvis, 407 U.S. 163, 176 (1972) (state licensing requirements do not make licensees into state actors); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974) ("Here the action complained of was taken by a utility company which is privately owned and operated, but which in many particulars of its business is subject to extensive state regulation. The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.").

In arguing that Puckett is a state actor, Plaintiffs focus on Ruffler v. Phelps Memorial Hosp., 453 F. Supp. 1062 (E.D. N.Y. 1978) and Brown v. Kennedy Krieger Institute, 997 F. Supp. 661 (D. Ma. 1998), which involved direct service providers like Puckett. As stated above, Ruffler involved the involuntary commitment of a mentally ill person, unlike here. Moreover, after Ruffler, the Second Circuit relied on Judge Sweet's historical analysis of New York's treatment of the mentally ill as traditionally not a public duty except to protect the public against those prone to violence to find no state action: "Based on this historical record, we cannot conclude that care of the mentally ill, much less the mentally disabled, was a function 'traditionally' and 'exclusively' reserved by the state." Sybalski, 546 F.3d at 259.

Brown also concerned involuntary commitment. Thus, Plaintiffs have not shown that Puckett or its employees were state actors under the public function test. Puckett's motion to

dismiss the § 1983 claim against it is granted. The Court declines to exercise supplemental jurisdiction over the wrongful death claim against Puckett.

**IT IS SO ORDERED.**

Dated: Jan. 5, 2014

ELIZABETH D. LAPORTE
Chief United States Magistrate Judge